UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BEULAH L. CRAIG, ) | |
| ) | 11-cv-2925 |
| Plaintiff, ) | |
| ) | Judge Sharon Johnson Coleman |
| v. ) | |
| ) | |
| CAROLYN COLVIN, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Beulah Craig seeks review of the Social Security Administration's decision denying her disability benefits.[1] An ALJ determined that Craig is not disabled under federal law. Craig requests that this court vacate the agency's decision or remand to the agency. Because substantial evidence supports the agency's decisions, its findings of fact are conclusive. The court, therefore, affirms the agency's decision.

**BACKGROUND**

*Legal Background*

Federal law provides benefits and supplemental security income to certain individuals who are disabled and who can no longer work. To be eligible for benefits, an individual must have a "disability" within the meaning of federal law. A person, generally, is disabled if he or she has an:

---

[1] Craig's complaint names Michael J. Astrue, the agency commissioner from 2007–2013, as the defendant. Carolyn Colvin, the current acting commissioner, is automatically substituted. Fed. R. Civ. P. 25(d).

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423c. Social Security employs a five-step process to determine whether an applicant for benefits is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920. Relevant here are both step four, which considers whether an applicant is able to perform past relevant work, s*ee id.*, and an intermediate step, one that the agency conducts between steps three and four, in which the agency considers the most that a person in the same position as the claimant is able to do. *See id.*; § 404.1545(a)(1).

*Factual Background*

In September 2007, Craig submitted both an application for disability benefits and an application for supplemental security income. Dkt. # 12-6 at 2–3 & 9–11. Craig stated that she became disabled on June 1, 2007, and that she sought benefits based on arthritis throughout her body and gout. *Id.* at 2, 9.

After reviewing Craig's submissions, on December 5, 2007, the agency denied Craig's applications because it found that she was not disabled. Dkt. # 12-4 at 2–3. The evidence indicated to the agency that Craig's conditions caused her some restrictions in her ability to function, but the agency concluded that she was still able to work based on her description of her work in data entry and as a clerical staffer. Dkt. # 12-5 at 8, 18–19. Craig requested reconsideration of the agency's decision, *Id.* at 9, and both a physician and a disability examiner independently reviewed Craig's request. Dkt. # 12-4 at 4–5. On March 14, 2008, Social Security affirmed its prior decisions. *Id.*

Upon Craig's request, Dkt. # 12-5 at 17, an ALJ in the agency's Office of Disability Adjudication and review held a hearing in Craig's case in Orland Park, Illinois on September 22, 2009. Dkt. # 12-3 at 28. At the time of the hearing, Craig was 5'2" in height and 245 pounds in weight. *Id.* at 38. She testified that around June 1, 2007, she began experiencing bad back pain, bad gout, swelling in her feet, aching in her knees, arthritis, and problems with her pelvis. *Id.* at 36. Craig explained that her feet swelling would last for about a month at a time and that the issue required her to put her feet in cold water. *Id.* Because of the swelling, Craig had to use crutches to walk and a motorized cart to go grocery shopping. *Id.* at 37, 39. She said that she could not walk a block, stand for fifteen minutes, or lift heavy objects, without pain. *Id.* at 38–39. Craig also testified to additional medical issues she experienced, including floaters, headaches, high blood pressure, and frequent urination during the day and night. *Id.* at 44–47. Craig's medication caused her to use the restroom about once an hour throughout the day. *Id.* at 47.

A medical expert who reviewed Craig's file testified that Craig suffered from degenerative joint disease, hip arthritis, hypertension, obesity, and gout. *Id.* at 52. In the expert's opinion, Craig's impairments were not comparable in severity to those listed in applicable regulations. *Id.* The expert related that Craig's medical files did not reflect frequent swelling from the gout and that he did not detect any "erosive changes," a sign of "active" gout. *Id.* at 54. The expert stated that "[p]ain caused by gout is excruciating" and explained that his opinion might differ if Craig's file showed requests for "extremely strong pain medication," bony changes, close follow-up by Craig's treating physician "for optimization of the uric acid," or frequent doctor visits to ensure an optimal uric-acid level. *Id.* at 55–56. Because the pain of a

gout attack is "so intense," the expert explained that it could only be treated by "strong narcotic medicine." *Id.* at 57.

A certified rehabilitation counselor characterized Craig's prior jobs as an insurance "sales agent," a "telephone solicitor," and a "data entry clerk." *Id.* at 60. The counselor testified that a sedentary person with Craig's limitations could not work as an insurance sales agent but could work as a telephone solicitor or a data-entry clerk. *Id.* at 61. According to the counselor, a sedentary person with Craig's limitations who also had to spend eight minutes every hour in the restroom would approach an "unacceptable" work situation. *Id.* at 63. Craig testified that she previously sold life and health insurance over the phone. *Id.* at 42.

Several months later, on March 23, 2010, the ALJ found that Craig was not disabled under the Social Security laws. Dkt. # 12-3 at 17. The ALJ provided a detailed explanation of the regulatory five-step process. *Id.* at 18–19. First, the ALJ determined that Craig failed to meet step three because although Craig's impairments were "severe" in nature, they were not the same as or comparable to those listed in applicable regulations. *Id.* at 19–20. Further, the ALJ found that Craig had the ability (i.e., the "residual functional capacity," in the agency's language) to perform sedentary to light work. *Id.* at 20–23. This caused Craig to fail to meet step four because the ALJ concluded that the evidence presented showed that she was capable of performing her past work as a data-entry clerk, insurance sales agent, or telephone solicitor. *Id.* at 23–24.

On May 18, 2010, Craig sought further review of the ALJ's decision with an appeals council, Dkt. # 12-3 at 12; Dkt. # 12-7 at 47–49, which denied review. Dkt. # 12-3 at 6. Before

this court, Craig argues that she is disabled within the meaning of the Social Security regulations because the ALJ failed to properly assess her ability to do work in various ways.[2]

**STANDARD OF REVIEW**

The agency's factual findings are "conclusive" if substantial evidence supports them. 42 U.S.C. §§ 405, 1383(c). This court may not "decide the facts anew, reweigh the evidence, or substitute [its] own judgment for that" of the agency. *Delgado v. Brown*, 782 F.2d 79, 82 (7th Cir. 1986).

**DISCUSSION**

*1. Gout*

Craig first argues that the ALJ's assessment of her ability to do work was flawed because the ALJ did not consider the frequency of her gout attacks. Craig critiques the following analysis in the ALJ's opinion:

> [A]s noted by the medical expert, x-rays showed no gouty changes as would be expected if gout was significant (3F, pg. 7) and objectively, claimant had normal strength in the upper and lower extremities, she was neurologically intact, there was only trace edema, straight leg raising was negative bilaterally and gout was improved (9F). There are no objective medical findings in the evidence of record that indicate that these conditions considered singularly or in combination with the claimant's other impairments render the claimant totally debilitated.

Dkt. # 12-3 at 22. Craig maintains that her own testimony, together with the medical records, shows that her gout attacks were "intermittent . . . on a recurring basis" and a "cyclical condition." Dkt. # 19 at 7. The ALJ, though, took note of Craig's testimony "that the swelling in her feet comes and goes." Dkt. # 12-3 at 21. Additionally, the pages of the medical record to

---

[2] After Craig filed her opening brief in support of vacating the ALJ decision, the government filed a motion for summary judgment under Rule 56.

5

which Craig cites do not undermine the ALJ's conclusion; if anything, they corroborate the ALJ's conclusion that the gout did not render her totally debilitated. For instance, one of the pages of medical notes pointed to by Craig states: "Had gout symptoms 1 wk ago, better now. Good relief from Ibuprofen." Dkt. # 12-8 at 62. At the hearing, the medical expert testified that gout often requires strong narcotic medicine.

Craig also criticizes the ALJ for not sending a portion of the medical record, submitted to the ALJ after the hearing, to a medical expert. Dkt. # 19 at 7. But there is no requirement that an ALJ consult a medical expert about every page in a record. Craig, relying on *Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2010), contends that the "Seventh Circuit has repeatedly admonished ALJs from improper medical determinations." In *Myles*, though, the ALJ drew a medical conclusion about a claimant's failure to take insulin. That kind of speculation, which the Seventh Circuit described as "playing doctor," is very different from what the ALJ did here, which was simply to relate the symptoms reported in the medical notes. For instance, the ALJ noted that "gout was improved," Dkt. # 12-3 at 22, and the medical notes report: "Gout flare improved," Dkt. # 12-8 at 62.

Additionally, Craig argues that the ALJ's consideration of x-ray evidence was "misplaced" because the record only contains "one foot x-ray taken of the left foot in November 2007." Dkt. # 19 at 18. Craig maintained, however, that her disability began in June 2007, so the ALJ's consideration of a November 2007 x-ray report, if anything, demonstrates a thorough examination of the medical record. Also, the medical file indicates, contrary to Craig's assertion, that more than "one foot x-ray" was taken. Dkt. # 12-8 at 18. Craig argues that the "record does not contain any foot x-rays after 2007, and the ALJ did not request any." Dkt. # 19 at 9. Requesting additional x-rays to substantiate Craig's symptoms was not the ALJ's responsibility.

6

In short, Craig argues that the ALJ's analysis was flawed for failing to make a specific finding, on the record, about the frequency of Craig's gout attacks. But, again, there is no requirement that the ALJ determine precisely the number of times per year that a claimant experiences gout attacks. Craig is correct that in *Boiles v. Barnhart*, the Seventh Circuit found that the ALJ erred in failing to make a finding about the frequency of a claimant's seizures, 395 F.3d 421, 427 (7th Cir. 2005), but that was because the Social Security regulation concerning the applicable impairment, i.e., epilepsy, turned on the frequency of symptoms. *Indoranto v. Barnhart*, also relied on by Craig, does not require the ALJ, as Craig maintains, to determine the exact frequency of every impairment; there, the ALJ's order totally omitted any discussion of how certain impairments affected the claimant's ability to work. 374 F.3d 470, 474 (7th Cir. 2004). Here, the ALJ committed no legal error, and substantial evidence supports her analysis of the gout's effect on Craig's ability to work.

*2. Restroom Breaks*

The ALJ's assessment of Craig's ability to work included the following limitation: "The claimant would also need regular access to the bathroom." Dkt. # 12-3 at 20. Craig faults the ALJ for "offer[ing] no explanation for this finding," a finding that is favorable to Craig. Dkt. # 19 at 10. Craig cites her own testimony regarding her need to use the restroom frequently, but the ALJ did not disregard this testimony. To the contrary, the ALJ's conclusion is consistent with Craig's testimony. Craig also faults the ALJ for not making specific references about the frequency and duration of Craig's restroom breaks. The ALJ was not required to do so. But the ALJ did conclude that Craig needed "regular" breaks. It is true that the ALJ did not make a specific finding as the *duration* of Craig's required restroom breaks, but Craig did not testify

7

about the length of her time in the restroom. At the hearing, Craig's lawyer posed a hypothetical question to the vocational expert about a person who spent eight minutes per hour in the restroom, Dkt. # 12-3 at 62–63, but this hypothetical created no requirement for the ALJ to determine the length of Craig's restroom breaks. Craig faults the ALJ for failing to do what the ALJ was not required to do.

*3. Headaches*

Craig argues that the ALJ did not account for headaches in determining Craig's ability to work. Dkt. # 19 at 11–13. The ALJ, however, in its sixteen-paragraph explanation of its residual-capacity determination included a paragraph on Craig's headaches:

> [T]he claimant reported that her headaches were moderate in severity and occurred about once a day. A CT scan of the head on June 12, 2009, showed no acute intracranial process. There was no midline shift, mass effect extra-axial fluid collections, cortical-based areas of infarction, or intra-parenchymal hemorrhage. Ventricles and sulci were appropriate for the claimant's age and the basilar cisterns were patent. There were no acute fractures or abnormal soft tissue swelling. Her visual acuity was 20/30 bilaterally (Exhibit 6F).

Dkt. # 12-3 at 21.

Craig argues that the ALJ did not "fully consider" the headaches and "failed to assess the resulting functional limitations" from the headaches, Dkt. # 19 at 12, but the ALJ's opinion reflects a thorough consideration of all evidence in the record about headaches. Craig does not contend that the ALJ ignored parts of her testimony or large pieces of the medical records. Craig cites *Shauger v. Astrue* in support of the proposition that an ALJ must consider the timing of, duration of, and treatments for a claimant's headaches. *See* 675 F.3d 690, 697–98 (7th Cir. 2012). But in *Shauger*, the claimant offered extended testimony on these points, which the ALJ

totally ignored. *Id.* at 697. There is no requirement that an ALJ always assess the timing and duration of a claimant's headaches, especially when a claimant does not offer detailed testimony.

*4. Physician Opinions*

Next, Craig argues that the ALJ improperly considered the opinions of two physicians when analyzing her ability to do work. The ALJ reviewed the opinions of Craig's treating physician and an independent expert in internal medicine. Craig faults the ALJ for not specifically addressing the treating physician's indication that Craig's pain would frequently interfere with her attention and concentration to do simple tasks. But "the ALJ need not discuss every piece of evidence in the record." *Indoranto*, 374 F.3d at 474. The statement to which Craig cites derives from one question in a fifteen-page questionnaire completed by the treating physician. Dkt. # 12-8 at 53. The ALJ's discussion of the treating physician's opinion, however, indicates that the ALJ read, considered, and cited to the physician questionnaire. Dkt. # 12-3 at 22. The case relied on by Craig in support of her argument, *Punzio v. Astrue*, suggests that ALJs should analyze a physician's "treatment notes as a whole," which is exactly what the ALJ did. 630 F.3d 704, 710 (7th Cir. 2011). Craig also contends that the ALJ did not weigh the treating physician's opinion in the manner required by 20 C.F.R. §§ 404.1527(c), 416.927(c). The ALJ's analysis is consistent with applicable regulations, and an "ALJ need not detail every reason for discounting a treating physician's report" or portion of a report. *Wurst v. Colvin*, 520 F. App'x 485, 488 (7th Cir. 2013). Craig, citing *Bjornson v. Astrue*, maintains that it is reversible error for an ALJ to weigh improperly physician opinion evidence. *See* 671 F.3d 640, 647–48 (7th Cir. 2012). In *Bjornson*, though, the ALJ dismissed a physician's opinion, speculating that it was made simply to sympathize with a patient, and the ALJ also gave "decisive weight" to a non-

9

specialist. *Id.* at 647. It is the ALJ's responsibility to weigh the evidence. Craig's arguments ultimately go to the weight of the evidence.

*5. Craig's Credibility*

Craig argues that the ALJ also erred in failing to assess her credibility in accordance with law. A Social Security regulation outlines how ALJs should make findings about claimant's credibility as to pain and its effects. S.S.R. 96-7p (S.S.A.), 1996 WL 374186 (July 2, 1996). The policy requires ALJs to consider a claimant's own testimony and the entire case record, including objective medical evidence. Under the policy, ALJs should not disregard a claimant's statements solely because they are not substantiated by medical evidence. As the Seventh Circuit explained, "the ALJ cannot reject a claimant's testimony about limitations on her daily activities solely by stating that such testimony is unsupported by the medical evidence." *Indoranto*, 374 F.3d at 474.

Craig argues that the ALJ erred in finding her not credible. Dkt. # 19 at 15–16. Although the ALJ's finding relied on "agency language,"[3] Craig points to no statement of hers that the ALJ deemed not credible, unreasonably disregarded, or afforded insufficient weight.

---

[3] To be sure, the ALJ *did* state that "the claimant's statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible *to the extent [that]* they are inconsistent with the . . . residual functional capacity assessment." Dkt. # 12-3 at 21 (emphasis added). It is true that the Seventh Circuit has been severely critical of this boilerplate language in ALJ opinions. *See*, *e.g.*, *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012). But the inclusion of this boilerplate language, albeit disfavored by the Seventh Circuit, is not per se ground for reversal.

10

*6. Obesity*

The ALJ determined, favorably to Craig, that her obesity aggravated her other conditions. Specifically, the ALJ stated: "It is reasonable to conclude that the claimant's obesity has the effect of aggravating her other medical conditions . . . ." Dkt. # 12-3 at 20. Craig claims that this non-adverse finding by the ALJ violates S.S.R. 02-1p because the ALJ did not sufficiently explain how Craig's obesity affected her other medical conditions. Social Security promulgated the policy statement after removing obesity from the list of impairments to remind adjudicators to consider the aggravating effects of obesity on other conditions, and the ALJ's statement is consistent with the policy statement. An "ALJ must factor in obesity when determining the aggregate impact of an application's impairments," *Arnett v. Astrue*, 676 F.3d 586, 593 (7th Cir. 2012), but the ALJ did just that. And this is not a case like *Martinez v. Astrue*, 63- F.3d 693, 698 (7th Cir. 2011), where the ALJ only mentioned obesity in its list of the claimant's severe impairments but "did not consider its significance in relation to" the claimant's other conditions. Here, the ALJ considered Craig's obesity as part of the determination about Craig's ability to perform work.

**CONCLUSION**

The court does not doubt the seriousness of Craig's medical condition. Nor does the court question Craig's sincerity in feeling disabled. But federal law affords disability benefits only to individuals who meet exacting criteria. The ALJ concluded that Craig meets some, but not all, of these criteria. A federal judge's review of an ALJ's decision is not de novo. Because substantial evidence supports the ALJ's determination that Craig is not disabled within the

11

meaning of the Social Security laws, the court affirms the agency's decision and grants the agency's motion for judgment.

DATED:   December 11, 2014

SHARON JOHNSON COLEMAN
United States District Judge